| | | |
|---|---|---|
| Natasha Buckley | * | IN THE |
| 8304 Cumberland Road | | |
| Springfield, WV 26763 | * | UNITED STATES |
| | | |
| And | * | DISTRICT COURT FOR THE |
| | | |
| Nick Buckley | * | DISTRICT OF MARYLAND |
| 8304 Cumberland Road | | |
| Springfield, WV 26763 | * | |
| | | |
| Plaintiffs , | * | Case No. |
| | | |
| v. | * | |
| | | |
| Suren Ekanayake, M.D. | * | |
| 12502 Willowbrook Road | | |
| Suite 550 | * | |
| Cumberland, Maryland 21502 | | |
| | * | |
| And | | |
| | * | |
| Tri-State Women's Health Center | | |
| 12502 Willowbrook Road | * | |
| Suite 550 | | |
| Cumberland, Maryland 21502 | * | |
| | | |
| Serve on: Ralph Donnelly | * | |
| 5246 Western Pike | | |
| Hancock, Maryland 21750 | * | |
| | | |
| And | * | |
| | | |
| Tri-State Community Health Center, Inc. | * | |
| 130-32 West Main Street | | |
| Hancock, Maryland 21750 | * | |
| | | |
| Serve on: Ralph Donnelly | * | |
| 5246 Western Pike | | |
| Hancock, Maryland 21750 | * | |
| | | |
| And | * | |
| | | |
| The United States of America | * | |
| U.S. Department of Justice | | |
| Attorney General | * | |
| Hon. Merrick B. Garland | | |
| 950 Pennsylvania Avenue, NW | * | |
| Washington, DC 20530 | | |
| | * | |
| | | |
| Serve: | * | |

Erek L. Barron                              *
U.S. Attorney for the
District of Maryland                        *
36 South Charles Street
4th Floor                                   *
Baltimore, MD 21201
                                            *
and
                                            *
Serve:
                                            *
Hon. Merrick B. Garland
Attorney General of the                     *
United States of America
950 Pennsylvania Avenue NW                  *
Washington, DC 20530
                                            *
          Defendans
                                            *

*    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT

COMES NOW Plaintiffs, by and through their undersigned attorneys, and respectfully files this

Complaint against the above-identified Defendants, and for their cause of action states:

## PARTIES

1.   Plaintiff, Natasha Buckley ("Ms. Buckley") is an adult resident of Springfield

West Virginia and is married to Nick Buckley.

2.   Plaintiff, Nick Buckley ("Mr. Buckley") is an adult resident of Springfield West

Virginia and is married to Natasha Buckley.

3.   Defendant, Tri-State Community Center, Inc. a/k/a and/or d/b/a Tri-state Women's

Health Center ("Tri-State"), is, and was at all times relevant to this action, a healthcare provider offering

services to the public at large including Plaintiffs, Nastasha and Nick Buckley in Cumberland, Maryland.

4.   Defendant, Suren Ekanayake, M.D., ("Dr. Ekanayake") is, and was at all times relevant

to this action, a healthcare provider who held himself out to Plaintiffs and to the general public as an

experienced, competent obstetrician and surgical gynecologist, possessing or providing that degree of

skill and knowledge which is ordinarily possessed by those who devote special study and attention to the

practice of obstetrics and surgical gynecology, offering services to the public at large including Plaintiffs, Natasha and Nick Buckley in the State of Maryland.

5. Upon information and belief, Defendant Tri-State was an actual and/or apparent agent, servant, and/or employee of Defendant United States of America.

6. Upon information and belief, Defendants, Tri-State, and/or Dr. Ekanayake, were agents, servants, and/or employees of United States of America.

7. At this time the United States of America has neither confirmed nor denied the employment of any named Defendant including, but not limited to, Defendant Tri-State and/or Dr. Ekanayake nor certified the scope of employment and/or agency relationship with the United States of America of any named Defendant including but not limited to, Defendant Tri-State and/or Dr. Ekanayake at the time of the events giving rise to this lawsuit. However, upon information and belief, at all times relevant hereto, Defendants Tri-State and Dr. Ekanayake, were actual and/or apparent agents, servants, and/or employees of the United States of America. Accordingly, the United States of America is responsible for the errors, negligent acts, omissions and/or commissions of negligence under the doctrine of *respondeat superior*.

8. Upon proper certification under the Federal Tort Claims Act, any employee of the United States of America who was acting within his/her/its scope of employment while rendering care unto the name Plaintiffs in this matter, the United States of America will stand in the place of said Defendant.

9. Plaintiffs timely filed their Form 95 with the United States Department of Health and Human Services on or about March 16, 2021. Said claim was denied on or about November 1, 2021. Plaintiffs are filing this Complaint within the six month period of time for filing this action against the United States of America after said denial.

10. Pursuant to 28 US Code Sec 2401, et. seq. and the Federal Tort Claims Act proper notice has been provided. The Form 95 was timely filed on March 16, 2021. The Department of Health and Human Services has acknowledged receipt of the claim on or about April 20, 2021. The Department of Health and Human Services formally denied the claim on November 1, 2021. See Exhibit 1. Therefore,

this Complaint is being filed within the six (6) month time period permitted by the Federal Tort Claims Act.

      11.  Therefore, Plaintiffs have properly and timely exhausted all administrative remedies under state and federal law.

      12.  Plaintiffs timely filed their Statement of Claim, the Certificate of Qualified Expert and Report of Richard Luciani, M.D., and the Waiver of Arbitration in the Health Care Alternative Dispute Resolution Office on or about March 3, 2022.  See Exhibit 2.  The case was assigned HCA No. 2022-089. An Order of Transfer was issued on or about March 8, 2022. See Exhibit 3.

## JURISDICTION AND VENUE

      13.  The amount of this claim exceeds the required jurisdictional amount as set forth in §3-2A-02 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland and the appropriate venue and jurisdiction for this suit is in the United States District Court for the Northern District of Maryland. Tri-State's and Dr. Ekanayake's primary places of business are located in Alleghany County, Maryland and the medical care and treatment giving rise to this Complaint was provided in Alleghany County, Maryland. Jurisdiction is conferred pursuant to 27 U.S.C. Sec. 1346 (USA as Defendant).

## BACKGROUND

      14.    Ms. Buckley was a then 38 years old female with a medical history of a hypercoagulable state factor 5 Leiden, DVT's and suppressed TSH.  She underwent a Cesarean Section due to fetal macrosomia of her 4th child at 39 weeks at Western Maryland Health System in Cumberland Maryland on January 11, 2019. She delivered a 10 lbs. 08oz boy. The OB/GYN who performed the Cesarean Section was Latasha Rabsatt, M.D., of Tri-State Health Care.

      15.    Ms. Buckley was discharged to home from Western Maryland Health System on January 15, 2019.

      16.    Ms. Buckley received her post-partum care and follow-up at Tri-State. She was evaluated by Dr. Rabsatt on January 23,2019 and her abdominal scar was well healed. She had no bowel or bladder problems.

17.    On March 6, 2019, Ms. Buckley called Tristate and left a message stating that she was spotting, cramping and had pain.  The message, while received, is illegible as to the author; however, upon information and belief, the message was received by an agent, servant and/or employee of Tri-State. Ms. Buckley was advised by Dr. Rabstatt that her spotting was most likely her period starting and to take motrin for pain.

18.    On March 26, 2019, Ms. Buckley was evaluated by Dr. Rabsatt at Tri-State for heavy bleeding for 10 days. Passing clots, last platelet count normal per patient, rectus diastasis discomfort were noted. By exam Dr. Rabstatt noted the presence of blood in her vaginal vault and light bleeding from the cervix.  She ordered a TSH, CBC, pelvic ultrasound Stat and instructed Ms. Buckley to follow up once completed.  An addendum to Dr. Rabsatt's note reflected that Ms. Buckley's sonogram showed a EMS (endometrial stripe) measuring 22mm. Dr. Rabsatt indicated that she offered a D&C but Ms. Buckley declined because she would like to see if the bleeding would resolve on its own. Ms. Buckley was instructed to follow up in two weeks.

19. On March 26, 2019, an ultrasound performed at Western Maryland Health System dictated by John Pappas, MD at 16:37 noted a thickened endometrial stripe likely due to hematoma or retained products, a follicle in left ovary and an enlarged uterus

20. On March 28, 2019, Ms. Buckley was evaluated by Dr. Rabsatt at Tri-State for a follow up. Her bleeding had stopped and she reported spotting.  She complained of a new left sided pain aggravated by movement.  Dr. Rabsatt noted a follicular cyst by sonogram on March 26  that could be the reason for pain due to a rupture of the cyst. Dr. Rabsatt noted if pain worsens to follow up and a urine culture was sent.

21. On March 29, 2019, Ms. Buckley presented to the emergency department at Western Maryland Health System with vaginal bleeding and abdominal pain and she was evaluated by ED physician Justin Cheesman, MD. After Dr. Cheesman's history and physical exam, his differential diagnosis was retained products of conception, dysmenorrhea, dysfunctional uterine bleeding, and coagulopathy.  He

further noted that Ms. Buckley saw Dr. Rabsatt 2 days ago and had an ultrasound which showed retained products of conception. She had a C-section in January and had been having vaginal bleeding since.

22.   A repeat pelvic ultrasound ordered by Dr. Cheesman in the emergency room on March 29, 2019, showed enlarged thickened endometrium likely due to retained products of conception. Therefore, Dr. Cheesman contacted Tristate Women's Health for an OB/GYN consultation.

23.   Dr. Ekanayake evaluated Ms. Buckley on March 29, 2019 and completed a preoperative history and physical. He noted Ms. Buckley's history of progressively worsening abnormal bleeding and the ultrasound results of thickened endometrial stripe due to retained products of conception. Dr. Ekanayake discussed options for treatment in detail: including a D&C, ablation as well as hysterectomy.  Ms. Buckley opted to proceed with D&C due to her history of increased bleeding and blood transfusions.  Ms. Buckley was admitted and plans for a D&C by another Tristate Phsycian, Dr. Rabsatt were made for later that day.

24.   On March 29,2019, Dr. Rabsatt performed a hysteroscopy, dilatation and curettage.  There were no noted complications during the procedure and she was sent to recovery overnight for observation given her history of bleeding. Endometrial curetting were sent to pathology.

25.   On March 30, 2019, post operative day 1, /Dr. Rabsatt evaluated Ms, Buckley. Per Dr. Rabsatt's physical exam, Ms. Buckley was in no apparent distress. She had no symptoms of acute blood loss or anemia. Her pain was controlled. Her vaginal packing was removed and scant old blood was noted. Her foley was removed and clear urine was noted. Her vitals were stable and she was discharged to home. Per Dr. Rabsatt instruction, she was to continue azithromycin for suspected endometritis and follow up in office in 2 weeks.

26.   On March 31, 2019, Ms. Buckley presented to the Emergency Department at Western Maryland Health System for heavy vaginal bleeding.  She was evaluated by Emergency Department physician, Aaryn Hammond, MD.  Dr. Hammond contacted Dr. Rabsatt for admission due to decreased hemoglobin of 9.8 and Ms. Buckley's history of post-operative bleeding. Dr. Rabsatt recommended a hematology consultation for her bleeding and she would evaluate her following hematology's consultation.

27. On March 31, 2019, hematologist Dr. Faye Yin evaluated Ms Buckley and noted her history of recurrent deep vein thrombosis in her upper extremities, free protein S deficiency 32%, fully recovered gestational thrombocytopenia, iron deficiency anemia due to vaginal bleeding and post- partum vaginal bleeding. Dr. Yin felt that she was not a candidate for tranexamic acid or birth control pills for her bleeding due to her history of DVT's and recommended local treatment. Dr. Yin recommended DVT prophylactic treatment in form of Lovenox for at least seven days and early ambulation if she pursed hysterectomy to treat her bleeding.

28. On March 31, 2019 at 8:20 pm, Dr. Rabsatt evaluated Ms. Buckley. Dr. Rabsatt noted Ms. Buckley's recent history of bleeding for 3 weeks and hysteroscopy, D&C performed on 3-29-19. She further noted that Ms. Buckley was discharged home the following day. She did not have any significant blood loss and her hematocrit and hemoglobin was stable at discharge. However, Ms. Buckley felt like she had more bleeding and passages of clots.  She was terrified that the bleeding would continue to the point that she would need a blood transfusion.  Dr. Rabsatt noted that this was the fourth time that she evaluated Ms. Buckley that week. Dr. Rabsatt noted that Dr. Yin evaluated Ms. Buckley and she was not a candidate for hormonal or traxemic acid therapy for her bleeding. Due to failed surgical management with D&C, Dr. Rabsatt discussed treatment options with Ms. Buckley and offered IR uterine embolization, endometrial ablation and/or a hysterectomy.  Ms. Buckley decided to proceed with definitive treatment for a transvaginal hysterectomy.

29. On April 1, 2019, Ms. Buckley continued to have light to heavy bleeding. Her hemoglobin was 8.7 and her hematocrit was 25.7.  She was noted as asymptomatic for her anemia. She was scheduled for her hysterectomy on April 2, 2019 with Dr. Ekanayake.

30. On April 2, 2019, Dr. Ekanayake attempted a transvaginal hysterectomy but it was converted to an abdominal hysterectomy with bilateral salpingectomy.  Dr. Ekanayake noted the following in his operative findings

"an enlarged uterus with evidence of a previous posterior wall uterine perforation and adhesions from the ventral wall of the uterus to the anterior aspect of the

bladder as well as the fascia. In his operative note, Dr. Ekanayake noted that the Bovie cautery was used to demarcate the area between the bladder and the cervix anteriorly, and sharp dissection was performed using a Metzenbaum scissor. Sharp dissection was also performed posteriorly. When the cul-de-sac was entered, a large amount of blood was expressed due to suspected previous intraabdominal bleed. The uterosacral ligaments were clamped, desiccated and transected with the aid of EN SEAL device. Additional dissections were performed laterally. However, further descensus was not possible even following separation of the corpus cervix from the bladder anteriorly. Fundal aspect of the uterus appeared to be adherent and further dissection and descensus was not considered possible using transvaginal approach. Therefore, a decision was made to convert into an open abdominal hysterectomy….

Dr. Ekanayake further indicated that once the procedure was converted open,

"the uterus was elevated with a single-tooth tenaculum. There was a moderate amount of hemoperitoneum, which was evacuated, and the posterior perforation was noted. The omentum appeared to be intact and hemostatic. The uteroovarian ligaments were desiccated and transected. Round ligaments as well as portion of the uterine vessels were desiccated and transected. Traction and counter traction were maintained on the cervix, which was gradually dissected off its thickened attachment to the ventral wall of the pelvis. Once dissection was appropriately completed, the specimen was amputated. The vaginal cuff was identified. Both right and left fallopian tubes were desiccated, transected and removed."

At the end of the operative procedure, Dr. Ekanakyake noted that since the patient was draining clear urine and there were no adhesions encountered on the lateral pelvic wall, a cystoscopy was not performed. However, in this note, Dr. Ekanakyake failed to identify and indicate how he maintained the integrity of the ureters during his ligation and dissection of the pelvic structures. Dr. Ekankayake failed to properly inspect the urinary tract or its structures for any potential sign of injury in a case with poor visualization due to the presence of adhesions and hemoperitoneum and the fact that clear urine was draining from the foley failed to correctly rule out the presence of any ureteral damage. Ms. Buckley received one unit of pack red blood cells due to intraoperative blood loss and a hemoglobin of 8.

31. On April 2,2019 at 2:39 pm, Melissa Rotruck, RN noted that she received Ms. Buckley from the PACU in severe pain. Ms. Rotruck notified anesthesia, Jennifer Long, CRNA, who administered a bolus through Ms. Buckley's epidural.

32. Ms. Buckley continued to complain of pain and was crying and moaning stating her pain was not controlled. CRNA Jennifer Long adjusted the epidural catheter. Pain was better controlled with the adjustment of the catheter.

33. On April 3, 2019 at approximately 9:00 am, post operative day one, Dr. Ekanayake evaluated Mr. Buckley and discontinued her epidural pain management and her foley.

34. On April 3, 2019 at approximately 12:21, Paula Shaffer, RN noted that she removed Ms. Buckley's foley catheter earlier that day and she was having difficulty voiding. Ms. Buckley agreed to try to drink and try again.

35. On April 3, 2019 at 6:10 pm, Nurse Shaffer noted that Ms. Buckley had a fever of 100.1, following her blood transfusion. IV morphine was given for low back pain and Nurse Shaffer paged Dr. Andrade who was covering physician for Dr. Ekanayake and Tristate.

36. At 6:39 pm, Nurse Shaffer noted that Ms. Buckley was crying in pain, stating that the IV morphine did not help. Her pain was worse on left side and Ms. Buckley was requesting a CT scan for fear that she had a clot following her blood transfusion. Nurse Shaffer paged Dr. Andrade again. Dr. Andrade ordered for a STAT CT scan.

37. On the evening of April 3, 2019, hematologist, Dr. Blanche Mavromatis evaluated Mr. Buckley. She was complaining of pain in her left flank, quite significant, with some petechiae since the PCA residual pain pump was removed. She also had a low-grade temperature around 6p.m. of 100.1. A CT of the abdomen and pelvis was ordered by her primary team out of concern for a possible bleed. Dr. Mavromatis noted her hemoglobin was 8.5 and hematocrit 25.4. From the hematology perspective, she noted that it was reasonable to transfuse her packed red blood cells. Ms. Buckley was concerned due to an allergic reaction to a blood transfusion in the past. Therefore Dr. Mavromatis ordered for her to be premedicated with Tylenol 650 mg PO.

38. At 22:54 pm, Nurse Shaffer indicated that she received results from CT scan via fax and called Dr. Andrade with results. Of note, the CT scan results were not dictated until the next morning on April 4, 2019 so it was unclear what the results demonstrated in Nurse Shaffer's progress note. Based on

these "results" Dr. Andrade ordered for a surgical consult and infectious disease consult. Per Dr. Andrade "if patient remains stable, does not become hypotensive or tachycardiac, then consults can wait until morning. If patient shows signs decline, call him and he will talk to surgeon on call"]On April 4, 2019 at 0046, Nurse Shaeffer noted that Ms. Buckley's BP was 85/46 and HR of 89. Dr. Andrade was notified and he called surgeon Dr. Birat Dhungel regarding Ms. Buckley.

39. At 01:30, Dr. Dhungel was at the beside and evaluated Ms. Buckley for a concern of post operative bleeding. He further noted that the CT scan done last night without IV contrast had not been read but thus far but shows post operative changes and fluid collection. A hematoma could be ruled out with the scan. He noted that Ms. Buckley complained of some lower abdominal pain. The pain was apparently dull and of moderate severity mainly in the left lower abdomen. without radiation. She denied any nausea or emesis. Dr. Dhungel noted that at that time, he was unable to rule out or confirm any active ongoing bleeding with a non -contrast CT. He further noted that she appeared stable and her hematocrit drop was gradual and not sudden. Herecommended  2 units of PRBC's and aCT of abdomen and pelvis with IV contrast. Dr. Dhungel noted that he discussed his recommendations with Dr. Andrade.

40. On April 4, 2019 at 07:28 am, The CT of the abdomen and pelvis interpreted by Paul Faucher, DO., showed extensive left retroperitoneal and perinephric fluid. The left collecting system was not more than slightly distended. The ureter was obscured by adjacent fluid. There was no calcified urolithiasis demonstrated. The bladder, right kidney and ureter were unremarkable, with bladder air consistent with catheterization. Integrity of the left ureter was in question, since transection of the ureter and urinoma could produce these findings. A contrast-enhanced CT with delayed imaging was noted to be considered.

41. On April 4, 2019 at approximately 10:43, Dr. Ekanayake, evaluated Ms. Buckley and noted that her pain was on her left lower quadrant and radiated to left flank. The pain noted initially on day 1  had significantly worsened.  She was transfused with 2 units of PRBC's. The CT scan done previously showed extensive left perinephric and periureteral fluid without obvious urolithiasis. The left ureter appeared to be obstructed and findings suggestive of a possible uroma or transection. Ms,

Buckley's creatine was elevated at 1.5.  Given these findings, there was a significant possibility of left ureteral compromise, either transection or obstruction. A urological consultation with Dr. Vasil Parousis was ordered.

42.    On April 4, 2019, a CT of the abdomen and pelvis with contrast was completed and interpreted by Marcos Roffe, MD. His findings noted gross extravasation of urine into the left perirenal space and retroperitoneum down into the pelvis. There was moderate left hydronephrosis and hydroureter. Given the history of recent hysterectomy the possibility of a ureteral injury should be strongly considered. These findings were shared with Dr. Ekanayake at 11:15 am.

43.    On April 4, 2019, urologist, Vasil Parousis, MD evaluated Ms. Buckley for a suspicious urinary leak and obstruction of the left collecting system.  Left hydronephrosis was noted and a suspected left ureteral injury. The plan was for a cystoscopy and left retrograde pyelogram and stent placement. Dr. John Pappas was placed on standby for the possibility of a left nephrostomy tube placement on that same day.

44.    On April 4, 2019, Dr. Parousis noted in his operative note that he was unable to pass dye or a wire 2.5 cm past the ureteral orifice.  He further noted that this was consistent with an obstructed ureter. Dr. John Pappas was called and he performed an antegrade pyelogram and nephrostomy tube placement. Dr. Pappas was unable to cannulate the area of injury. The ureter appeared to be shifted medially and was obstructed above the point that was analyzed on the retrograde pyelogram.  Dr. Parousis felt that given the amount of urinary extravasation and Ms. Buckley's bleeding issues, it was not safe to proceed with exploration at that time and plans for laparoscopic robotic assisted pelvic exploration for possible reimplantation would be planned in 4-6 weeks.

45.    Dr. Pappas operative note indicated that the antegrade nephrostogram demonstrated moderateleft-sided pelvocaliectasis and ureterectasis. There was an obstruction of the distal left ureter. Multiple attempts were made at passing the obstruction with an angled catheter and Glidewire; however, they were unsuccessful. A left nephrostomy catheter was placed.

46. On April 5,2019, an Infectious Disease consult by Rameet Thapa, MD, noted that Ms. Buckleywas afebrile.  She had urine mixed with blood in her nephrostomy tube. She was on cefazolin and azithromycin.  Her urine was clean thus far but given that she had urinary leakage throughout her abdomen, she should receive ceftriaxone 2gms daily for next few days.

47. On April 5, 2019, Dr. Ekanayake evaluated Ms. Buckley, and she was tolerating her diet adequately and still complaining of some left sided flank pain.  A repeat CT scan was planned. A consultation with Jason Riley, DO., urologic robotic surgeon was planned for after discharge.

48. On April 5, 2018, Dr. Parousis noted that Ms. Buckley was complaining of spasms in her back and pelvic area and denied any fever or chills. She was nauseous as well.  She continued to be anemic which was being monitored closely. The plan was to leave the nephrostomy tube in place for 4-6 weeks and then plan for robot-assisted laparoscopic pelvic exploration and possible ureteral implantation.

49. On April 6, 2019, A CT of the abdomen and pelvis without contrast was completed and demonstrated interval decompression of left-sided hydronephrosis secondary to percutaneous nephrostomy with resolution of the majority of the perinephric fluid collection demonstrated previously.

50. On April 6, 2019, Dr. Mavromatis noted that Ms. Buckley's bleeding subsided. Her hemoglobin was slowly trending down and recommended to continue to follow trend with a repeat CBC in am.  She further noted that repeat imaging did not show any evidence of bleed.

51. On April 7, 2019, Dr Parousis noted that Ms, Buckley's hemoglobin was improving at 10.1 and she felt better. Her urine output was good. She was voiding and had good output from her nephrostomy tube and the urine was clearing. She seemed to be stable for discharge from a urologic standpoint.

52. On April 7, 2019, OB/GYN for Tristate, Dr. George Khachan  evaluated Ms. Buckley and noted that she was feeling better.  Her CBC/CMP was repeated, and her anemia was stable. Her creatinine was normal. Her CT scan showed marked decrease in fluid around the kidney. She was to be assessed by Dr. Ekanayake the next day for possible discharge.

53. On April 8, 2019, Dr. Thapa noted that Ms. Buckley was still on ceftriaxone. Her urine cultures were negative, and most likely she did not develop any infection. However, given the presence of the nephrostomy tube, she was likely at risk to develop infection if the nephrostomy tubes remained in place. He ordered to transition her to Bactrim-DS 1 tab twice a day for 2 weeks. She should also get perioperative antibiotics to prevent infection at the time of the repair of the ureteric injury.

54. On April 8, 2019, Dr. Rabsatt evaluated Ms. Buckley and noted that she was stable for discharge and she was to follow up with urology. She was given proper teaching for care of nephrostomy tube and she was discharged to home to follow up with Dr. Riley in two weeks.

55. On April 9, 2019, Ms. Buckley presented to West Virginia University, Ruby Hospital Emergency Department with left sided flank pain. Her blood pressure was elevated at 130/100. She was complaining of left-sided flank pain and cramping surrounding the nephrostomy tube, as well as bloody output from the tube. She was evaluated by Emergency Department physician, Courtney Cundiff, MD. On exam, Dr. Cundriff noted minimal tenderness over the nephrostomy tube site. It was clean dry and intact and there was no overlying erythema or warmth. The remainder of her physical exam was within normal limits. Her urinalysis showed a large amount of red blood cells but was otherwise within normal limits. Her basic metabolic profile (BMP) and complete blood count (CBC) was within normal limits. The nephrostomy tube flushed easily. Ms. Buckley informed Dr. Cundriff that she wasn't able to follow up with Dr. Riley because he didn't accept her insurance and no followup was planned at that time. Dr. Cundriff noted that Urology was contacted , who stated that a KUB and an ultrasound should be obtained to ensure that the nephrostomy coil is in proper position, and that the tube itself flushes easily. The studies were both performed, which showed that the coil was in proper place, and the tube was flushed at bedside, and flushed easily. Ms Buckley was stable for discharge to home. She was given follow-up with Urology at WVU, Ruby urology clinic in 1 week. She was given return precautions for severe flank pain, fevers, chills, abdominal pain, vomiting, confusion, or other concerning symptoms.

56. On April 15, 2019, Ms. Buckley was seen at Tri-State  and evaluated by Dr. Rabsatt for a 2 week post op visit. She was complaining of back spasm on left side. She was instructed to follow up at WVU for back pain.

57. On April 29, 2019, Ms. Buckley underwent a cystourethroscopy, left retrograde pyelogram and left antegrade nephrostogram by Chad Morley, MD, at Ruby. Dr. Morley noted he was unable to pass sensor wire into the left ureter.  He also noted that obstruction was met only a few millimeters into the left ureter orifice.  The left retrograde pyelogram revealed no contrast entering the left ureter and the left antegrade nephrostogram consistent with complete obstruction at the level of the left UVJ. The plan was for a follow up with Dr. Michael Ost in early July for a left ureteral re-implant.  There were no complications from the procedure and she was discharged on the same day.

58. On June 10, 2019, Ms. Buckley was seen at her primary care office, EA Hawrse and was evaluated by Elizabeth Hott, NP for possible UTI. Nephrostomy tube draining clear urine. She was having bladder spasms frequently and abdominal pain with urination with increased frequency. Nephrostomy tube due to be removed in 20 days. Moderate white blood cells in urine. Bactrim prescribed one tablet twice a day for three days.

59. On June 19, 2019, Ms. Buckley was evaluated by Michael Ost, MD for her preop evaluation of her left ureteral injury. Dr. Ost noted that she had a left nephrostomy tube in place and had radiographic studies that showed the level of narrowing or stricturing to be right at the level of the bladder. The plan was for a left robotic or possible open ureteral reimplant with possible boari flap.  She was instructed to start Levaquin one week prior to the procedure.

60. On June 23, 2019 Ms. Buckley presented to Ruby Emergency Department with complaints of vaginal bleeding.  A GYN consultation was obtained by Dr. Karen Fluet who noted a small area of vaginal tissue from the left apex of the vaginal cuff that was prominent.  Silver nitrite was applied to the area and she was instructed to follow up with GYN in two weeks.

61. On July 1, 2019, Ms. Buckley underwent robotic assisted laparoscopic left neocystostomy (ureteral implant), refluxing, lysis of adhesions for 30 minutes, ureterolysis from the level

of the left iliacs to the uterovesical junction, left sided peritoneal flap 6cm x 6cm wrapped and tacked around anastomosis, and placement of a ureteral stent by Michael Ost, MD at WVU, Ruby Hospital.  She was admitted for post operative monitoring and pain control.

62.  On July 2, 2019, Dr. Ost noted that she had some nausea and vomiting but her pain was well controlled. She had a GYN consult for some vaginal cuff bleeding.

63.  On July 2, 2019, a gynecology consultation by Ossama Elsaccar, MD, noted the area at the left apex seen on June 23, 2019. Granulation tissue was noted and silver nitrate was applied.  There was no bright red blood and no pads were need. No active blood noted and spotting most likely due to irritation.  No other measures required at this time and GYN signed off.

64.  On July 3, 2019, Ms. Buckley was tolerating her diet her pain was controlled and she was ambulating without difficulty.

65.  On July 4, 2019, Dr. Ost evaluated Ms. Buckley, she reported much less pain than with her prior surgeries.  She was stable for discharge.  She was discharged with oral pain medication, prophylactic cipro, her foley catheter and an indwelling ureteral stent.  She was instructed to call Dr. Ost office for a follow-up appointment.

66.  On July 10, 2019, Ms. Buckley presented to Dr. Ost office for a trial of void.  She complained of some aches and pains but denied fever or chills.  Her right trocar site had some fibrinous necrosis at skin edge but all other wounds dry and intact.  Her foley was removed for trial of void.  Dr. Ost noted to monitor for successful trial of void, and to schedule for her stent removal in 4 weeks. She was given a prescription for Bactrim and instructed to take one week prior to stent removal.

67.  On August 8, 2019, Ms. Buckley underwent a cystoscopy with removal of the left ureteral stent by Dr. Stanley Kandzari at West Virginia Ruby. There were no noted complications of the procedure and she was discharged on the same day. She was instructed to follow up with Dr. Ost in three weeks for a renal ultrasound.

68.  On September 4, 2019, Ms. Buckley was seen in Dr. Ost's office. A renal ultrasound was

performed and was reviewed by Dr. Ost who noted mild dilation f the renal pelvis left is greater than right.  She complained of low back pain causing numbness in her left leg and left lower quadrant numbness. Dr. Ost recommended to follow up in six months for a renal ultrasound but could start physical therapy and have MRI to address low back issues.

69.    On October 8, 2019, a MRI of the left hip completed at Valley Health System Winchester Imaging, demonstrated mild chondral labral separation of the superior lateral aspect of the left acetabular labrum and mild degenerative changes inferior aspect of the SI joints greater on the left.  On October 16, 2019, Ms. Buckley presented to her primary care office to discuss the results of the MRI.  She was evaluated by Elizabeth Hott, NP.  Ms. Buckley stated that her back pain started following the numerous surgeries she has had since her delivery. Nurse Hott discussed the mild chondral labral separation of the left acetabular labrum and mild degenerative changes inferior aspect of the SI joints greater on the left. Nurse Hott encouraged Ms. Buckley to continue with her diet and exercise program with PTOn October 29, 2019, Ms. Buckley presented to her primary care office with complaints of bladder spasms, burning with urination, low back pain, and suprapubic pressure and pain. She stated that the pain felt like she was "peeing glass" but had never had kidney stones.  She was evaluated by Elizabeth Hott, NP and given a prescription for Bactrim DS one tablet twice daily for 5 days.

70.    On March 11, 2020, a renal ultrasound showed minimal dilation of the renal pelvis greater on the left similar to August 2019. She was evaluated by Dr. Ost who noted that she was seeing physical therapy and working on muscle strength to help her abdominal core pelvis hip thighs and back. She noticed some progress. She stated that she does have dysuria and bladder spasms but she stated that she did not want any medications. An MRI of her spine as well as her left hip demonstrated a torn labral separation of the superior lateral aspect of the left acetabular labrum. She denied any gross hematuria or urinary tract infections. Dr. Ost noted to follow up in one year with a renal ultrasound or sooner if she had any issues and to continue with PT for her low back concerns.

71.    On March 23, 2020, Ms. Buckley presented to her primary care office and was evaluated by Elizabeth Smith, MD, for her annual GYN exam. She was complaining of left hip and flank pain.  Ms.

Buckley stated that renal doctors anticipated some scarring of the kidney within the first two years and will continue to follow with renal sonograms.

72. On June 26, 2020, Ms. Buckley had a CT of her kidneys for some left flank pain. A 48 mm left ovarian cyst was found that appeared to be new or increased when compared to outside pelvic ultrasound from 8/26/19. There was no hydronephrosis or urolithiasis.

73. On February 21, 2021, Ms. Buckley had a pelvic/kidney ultrasound at Potomac Valley Hospital of West Virginia for left flank pain that demonstrated both kidneys had normal sonographic appearances and there was no hydronephrosis or obvious ureterolithiasis.

74. On February 24, 2021, Ms. Buckley was evaluated by Dr. Ost. She continued to report left flank pain and left back pain which she stated could be from her left hip. She had a UTI one week ago that was treated with Bactrim. She denied hematuria. She had history of left ovarian cyst that was stable. Dr. Ost ordered ditropan for her abdominal pain as he stated it could be from bladder spasms. She declined the medication at that time. Dr. Ost ordered to return for renal sonogram in one year.

75. Currently, Ms. Buckley continues to suffer with bladder spasms, abdominal pain and left flank pain.

76. To a reasonable degree of medical certainty, Dr. Ekanayake knew, or should have known that prevention of iatrogenic ureteral injury in gynecological surgery required intraoperative identification and re-identification of the ureters through meticulous surgical technique before, during and after ligation and dissection of the pelvic structures during a hysterectomy.

77. As a result of Ms. Buckley's ureteral injury she has suffered and will continue to suffer, serious injuries and damages including but not limited to immense weakness and pain in her left hip, left flank, bladder spasms and constant pain from scar tissue.

78. Defendant Dr. Ekanayake was the attending physician assigned to render the necessary care and treatment to Natasha Buckley.

79. At all times relevant, Defendant Dr. Ekanayake individually and as the actual

and/or apparent agents, servant, and/or employee of Defendant Tri-State Women's Health Center and/or Defendant United States of America owed a duty to Plaintiffs to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to practice of surgical gynecology.

80.  Defendant Tristate Women's Health Center, on information and belief, individually and as the employer of Dr. Ekanayake, were to provide the gynecological care to Natasha Buckley.

81.  At all times relevant, Defendant Tristate Women's Health Center individually and as the actual and/or apparent agent, servant and/or employee of Defendant United States of America owed a duty to Plaintiffs to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to the practice of surgical gynecology.

82.  At all times relevant Defendants owed to Plaintiffs a duty to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care prover acting upon the same or similar circumstances.  Defendants, individually and collectively, breached said duty proximately causing injuries and damages to Plaintiffs as described hereinabove and below.

## COUNT I
### (Medical Negligence-Natasha Buckley v. Dr. Ekanayake)

Plaintiff Natasha Buckley, hereby sues Defendant, Dr. Ekanayake and for cause of action states:

83.  Plaintiff incorporates by reference in this count those facts set forth in each and every paragraph hereinabove, intending each and every allegation herein above to be deemed part of this count as if the same were repeated separately.

84.  Defendant Dr. Ekanayake, individually and/or as the apparent and/or actual agents, servant, and/or employee of Defendant Tristate and/or United States of America owed a duty of care to Plaintiff to exercise such degree, skill and learning required or expected of a reasonable, prudent health care provider acting upon the same or similar circumstances.

85.  Defendant, Dr. Ekanayake, individually and/or as the apparent and/or actual agents,

servant, and/or employee of Defendant Tristate and/or United States of America failed to appreciate the duty of care that was required upon him; laced the training, knowledge, and/or experienced required upon him to understand the duty of care required of him; and/or failed to meet the standard of care as required of him.

86.  Defendant, Dr. Ekanayake, individually and/or as the apparent and/or actual agents, servant, and/or employee of Defendant Tristate and/or United States of America breached and/or deviated from the applicable standards of care on April 2,2019, and was otherwise negligent in that he, among other things:

   a.  Failed to identify Ms. Buckley as a high risk for potential complications due to her obesity, previous abdominal procedures and recent c-section;

   b.  Failed to correctly identify and protect the left ureter during each step of the surgical procedure;

   c.  Failed to identify and isolate the structures of the lower urinary tract;

   d.  Failed to acknowledge and continuously assess the common locations of potential ureteral injury during the procedure;

   e.  Failed to have a high level of suspicion for a potential ureteral injury before, during and after the procedure;

   f.  Failed to appropriately identify the left ureters' location prior to and during the dissection and ligation of the pelvic structures to avoid injury;

   g.  Failed to frequently and repeatedly assess the location and integrity of the ureter during the procedure;

   h.  Failed to timely identify the ureteral injury intraoperatively;

   i.  Failed to perform a cystoscopy following the procedure to assess for any potential injury to the ureters;

   j.  Failed to timely identify the ureteral injury postoperatively;

   k.  Failed to indicate when and where the ureters where identified in the operative note; and

l.  In all other respects was negligent in his treatment and care of Ms. Buckley.

87. The applicable standard of care required that Dr. Ekanayake:

a.  Properly identify and protect the ureters during the transvaginal and abdominal hysterectomy;

b.  Continuously assess and re-assess the location and integrity of the ureters during and after the procedure;

c.  Properly locate ureters prior to and during the ligation and dissection of the pelvic structures;

d.  Repeatedly assess the location and integrity of the ureters during the procedure;

e.  Take the necessary care and precaution to prevent a urological injury in a high risk patient; and

f.  Timely identify the ureter injury and provide timely repair to minimize the extent of damages.

88. Plaintiff also asserts the doctrines *res ipsa loquitor* and *respondeat superior.*

89. As a direct result of the negligence of the above named Defendants, individually, and collectively, Ms. Buckley endured severe pain, suffering, emotional distress, numerous complications resulting from the negligence identified herein above, required multiple hospitalizations and multiple surgical procedures, and was otherwise permanently injured and damaged.

90. The injuries and damages herein complained of were directly and proximately caused by the negligence of Dr. Ekanayake with no negligence on the part of Ms. Buckley contributing hereto.

91. Had the Defendants, taken the necessary care and precautions to avoid the injury to the left ureter, he would have avoided and/or timely recognized the injury to the ureter and avoided all of the subsequent complications, including but not limited to the need for additional procedures/surgeries, including a left neocystostomy (ureteral implant), refluxing, lysis of adhesions for 30 minutes, ureterolysis from the level of the left iliacs to the uterovesical junction, with left sided

peritoneal flap 6cm x 6cm wrapped and tacked around anastomosis and all the complications, injuries, and damages that flowed therefrom.

WHEREFORE, Natasha Buckley claims damages and requests that a judgment be entered against the above identified Defendants, jointly and severally, for compensatory damages in excess of the jurisdictional amount.

## COUNT II

## Medical Negligence Natasha Buckley v. Tri-State Community Health Center, Inc. a/k/a or d//b/a Tri-State Women's Health Care

92. Each of the preceding paragraphs in incorporated herein by reference.

93. Defendant, individually and/or through its actual/or apparent agent, servant, and/or employee including but not limited to Defendant, Dr. Ekanayake owed a duty of care to Plaintiff, Natasha Buckley to exercise such degree, skill and learning required or expected of a reasonable, prudent health care provider acting upon the same or similar circumstances.

94. Defendant, Tristate, individually and/or through its actual and/or apparent agent, servant, and/or Defendant, Dr. Ekanayake either failed to appreciate the duty of care that was required of them; lacked the training, knowledge, and/or experience required of them to understand the duty of care required of them; and/or failed to meet the standard of care as required of them.

95. Defendant Tristate, individually and/or through its actual and/or apparent agent, servant, and/or employee Defendant Dr. Ekanayake, was negligent and careless in the following respects:

    a.   Failed to identify Ms. Buckley as a high risk for potential complications due to her obesity, previous abdominal procedures and recent C-section;

    b.   Failed to correctly identify and protect the left ureter during each step of the surgical procedure;

    c.   Failed to identify and isolate the structures of the lower urinary tract;

    d.   Failed to acknowledge and continuously assess the common locations of potential ureteral injury during the procedure;

e. Failed to have a high level of suspicion for a potential ureteral injury before, during and after the procedure;

f. Failed to appropriately identify the left ureters' location prior to and during the dissection and ligation of the pelvic structures to avoid injury;

g. Failed to frequently and repeatedly assess the location and integrity of the ureter during the procedure;

h. Failed to timely identify the ureteral injury intraoperatively;

i. Failed to perform a cystoscopy following the procedure to assess for any potential injury to the ureters;

j. Failed to timely identify the ureteral injury postoperatively;

k. Failed to indicate when and where the ureters where identified in the operative note; and

l. In all other respects was negligent in his treatment and care of Ms. Buckley.

96. Plaintiff also asserts the doctrines *res ipsa loquitor* and *respondeat superior.*

97. As a direct result of the negligence of the above named Defendants, jointly and severally, Mr. Buckley endured severe pain, suffering, emotional distress, numerous complications resulting from the negligence identified herein above, required multiple hospitalizations and multiple surgical procedures, and was otherwise permanently injured and damaged.

98. Had the Defendants taken the necessary care and precautions to avoid the injury to the left ureter, he would have avoided and/or timely recognized the injury to the ureter and avoided all of the subsequent complications, including but not limited to the need for additional procedures/surgeries, including a left neocystostomy (ureteral implant), refluxing, lysis of adhesions for 30 minutes, ureterolysis from the level of the left iliacs to the uterovesical junction, with left sided peritoneal flap 6cm x 6cm wrapped and tacked around anastomosis and all the complications, injuries, and damages that flowed therefrom.

WHEREFORE, Natasha Buckley claims damages and requests that a judgment be entered against the above identified Defendants jointly and severally, for compensatory damages in excess of the jurisdictional amount.

**COUNT III**
**Medical Negligence**
**Natasha Buckley v. The United States of America**

99.  Each of the preceding paragraphs is incorporated herein by reference.

100.      Defendant United States of America, individually and/or through its actual and/or apparent agents, servants, and/or employees Defendant Tristate and/or Defendant Dr. Ekanayake owed a duty of care to Natasha Buckley to exercise such degree, skill, and learning required or expected of a reasonable, prudent health care provider acting upon the same or similar circumstances.

101.      Defendant United States of America, individually and/or through its actual and/or apparent agents, servants, and/or employees Defendant Tristate and/or Defendant Dr. Ekanayake either failed to appreciate the duty of care that was required of it; lacked the training, knowledge, and/or experience required of it to understand the duty of care required of it; and/or failed to meet the standard of care as required of it.

102.      Defendant United States of America, individually and/or through its actual and/or apparent agents, servants, and/or employees Defendant Tristate and/or Defendant Dr. Ekanayake, was negligent and careless in the following respects:

 a.  Failed to identify Ms. Buckley as a high risk for potential complications due to her obesity, previous abdominal procedures and recent C-section;

 b.  Failed to correctly identify and protect the left ureter during each step of the surgical procedure;

 c.  Failed to identify and isolate the structures of the lower urinary tract;

 d.  Failed to acknowledge and continuously assess the common locations of potential ureteral injury during the procedure;

    e.    Failed to have a high level of suspicion for a potential ureteral injury before, during and after the procedure;

    f.    Failed to appropriately identify the left ureters' location prior to and during the dissection and ligation of the pelvic structures to avoid injury;

    g.    Failed to frequently and repeatedly assess the location and integrity of the ureter during the procedure;

    h.    Failed to timely identify the ureteral injury intraoperatively;

    i.    Failed to perform a cystoscopy following the procedure to assess for any potential injury to the ureters;

    j.    Failed to timely identify the ureteral injury postoperatively;

    k.    Failed to indicate when and where the ureters where identified in the operative note; and

    l.    In all other respects was negligent in his treatment and care of Ms. Buckley.

103.    Plaintiff also asserts the doctrines *res ipsa loquitor* and *respondeat superior.*

104.    As a direct result of the negligence of the above named Defendants jointly and severally, Ms. Buckley endured severe pain, suffering, emotional distress, numerous complications resulting from the negligence identified herein above, required multiple hospitalizations and multiple surgical procedures, and was otherwise permanently injured and damaged.

105.    Had the Defendants, taken the necessary care and precautions to avoid the injury to the left ureter, he would have avoided and/or timely recognized the injury to the ureter and avoided all of the subsequent complications, including but not limited to the need for additional procedures/surgeries, including a left neocystostomy (ureteral implant), refluxing, lysis of adhesions for 30 minutes, ureterolysis from the level of the left iliacs to the uterovesical junction, with left sided peritoneal flap 6cm x 6cm wrapped and tacked around anastomosis and all the complications, injuries, and damages that flowed therefrom.

WHEREFORE, Natasha Buckley claims damages and requests that a judgment be entered against the above identified Defendants, jointly and severally. for compensatory damages in excess of the jurisdictional amount.

## COUNT IV
## (Loss of Consortium Claim by Nick Buckley and Natasha Buckley against All Defendants

Plaintiffs, Nick Buckley and Natasha Buckley, hereby sue the Defendants, Suren Ekanayake, M.D., Tristate Women's Health Center and The United States of America jointly and severally, and for the cause of action state:

108.    All of the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

109.    The wrongful conduct of the Defendants, as set forth above, which directly and proximately caused injury to Ms. Buckley, also directly and proximately caused injury to the marital relationship of Mr. Buckley and Mrs. Buckley.

110.    Mr. Buckley and Ms. Buckley's injuries were directly and proximately caused by the wrongful conduct of the Defendants with no negligence on the part of Mr. Buckley or Mrs. Buckley contributing thereto.

WHEREFORE, Plaintiffs, Nick Buckley and Natasha Buckley, request that a judgment be entered against the Defendants, Suren Ekanayake, M.D., Tri-State Community Health Center, Inc. a/k/a or d/b/a Tri-State Community Health, and The United States of America, jointly and severally, for compensatory damages in excess of the jurisdictional amount.

/s/ Frederic C. Heyman

_____
Frederic C. Heyman (06013)
Jamison G. White (26505)
Bennett & Heyman, P.A.
25 Hooks Lane, Suite 310
Baltimore, MD 21208
410-727-2168 (t)
410-547-8621 (f)
fred@bennettheymanlaw.com
jamie@bennettheymanlaw.com

Counsel for the Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in this matter.

/s/ Frederic C. Heyman

_____
Frederic C. Heyman (06013)